UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------------X
                                     :

TANISIA N. BAKER,               :

                                   :

                Plaintiff,       :

                                   :         19 Civ. 1093 (JPC)

        -v-               :

                                   :        OPINION AND

CARL WEBER *et al.*,           :          ORDER

                                   :

                Defendants.    :

                                   :
-------------------------------------------------------------------X

JOHN P. CRONAN, United States District Judge:

      Plaintiff Tanisia Baker sued Defendants Carl Weber, Urban Books, LLC, Urban Books Media, LLC, and Kensington Publishing Corporation ("Defendants") as well as Vickie Stringer, Vickie Stringer Publishing, LLC, Triple Crown Publications, and Vickie Stringer Agency, LLC (the "Defaulting Defendants") for copyright infringement and other related claims.  Baker claims that for years Defendants relied on a nonexistent license to publish and distribute two of her books. She now moves for partial summary judgment on her copyright infringement claims against Defendants.  She also moves for default judgment against the Defaulting Defendants, who never responded to her complaint.

      The Court denies both motions.  There are genuine issues of material fact on whether Defendants infringed Baker's copyrights.  These include questions on whether Defendants had an actual (or implied) license to distribute her works, which would provide a defense to copyright infringement.  Because Baker's default judgment motion relies in part on these factual questions, the Court also denies the motion for default judgment.

## I.  Background

### A.  Facts[1]

Baker is an author who wrote two books that are at issue in this case, *Sheisty* and *Still Sheisty*.  Pl. 56.1 Stmt. ¶¶ 1-2.  She holds the copyright for *Sheisty* at Registration Number TXu001142798/2003-08-19 and *Still Sheisty* at Registration Number TXu001200086/2004-09-08.  *Id.*; Dkt. 89 ("Baker Declaration") ¶¶ 2-3, Exhs. 1-2.  Defendants have noted, however, that other copyrights for *Sheisty* and *Still Sheisty* exist.  Def. Counter 56.1 Stmt. ¶¶ 1-2; Dkt. 97 ("Lane Declaration") ¶¶ 3-4, Exhs. A-C.  This includes a copyright for *Still Sheisty* which lists Triple Crown Publications as the copyright claimant—Registration Number TX0006125092/2005-01-28.  Def. Counter 56.1 Stmt. ¶ 2; Lane Declaration ¶ 5, Exh. C.

In 2003, Baker signed a publishing agreement with Triple Crown Publications, an LLC owned by Vickie Stringer.  Pl. 56.1 Stmt. ¶ 4; Baker Declaration ¶ 4, Exh. 3 ("2003 Agreement").  The 2003 Agreement gave Triple Crown Publications "the sole and exclusive right to print, publish and sell" *Sheisty* and *Still Sheisty*.  2003 Agreement ¶ 1.  In return, Triple Crown Publications agreed to pay Baker royalties, including "ten percent (10%) of the retail price" of the books.  *Id.* ¶ 3.  A different royalty structure existed if Triple Crown Publications choose to "sell or license . . . the use of the [books]."  *Id.* ¶ 4.  In that scenario, Triple Crown Publications had to divide the net sales equally between itself and Baker.  *Id.*  Triple Crown Publications had to pay Baker any

---

[1]  The following facts are drawn primarily from the parties' statements of material facts pursuant to Local Civil Rule 56.1, Dkt. 92 ("Pl. 56.1 Stmt."); Dkt. 99 ("Def. Counter 56.1 Stmt."), and the declarations and other submissions made by the parties.  Unless otherwise noted, the Court cites to only one party's Rule 56.1 Statement where the parties do not dispute the fact, the adverse party has offered no admissible evidence to refute that fact, or the adverse party simply seeks to add its own "spin" on the fact or otherwise dispute the inferences from the stated fact.

owed royalties twice a year and then provide royalty statements within 120 days after the royalties were due.  *Id.* ¶ 5.

The 2003 Agreement also included three relevant assignment provisions.  First, Triple Crown Publications could assign the agreement to others.  *Id.* ¶ 15.  Second, Baker could end the agreement if her books were out of print after "five (5) years from the date of first publication." *Id.* ¶ 13(b).  Third, Baker could end the agreement in certain situations:

> **<u>BANKRUPTCY:</u>** If (a) petition in bankruptcy is filed by Publisher, or (b) a petition in bankruptcy is filed against Publisher and such petition is finally sustained, or (c) a petition for arrangement is filed by publisher or a petition for reorganization is filed by or against Publisher, and an order is entered directing the liquidation of Publisher as in as in [sic] bankruptcy, or (d) Publisher makes an assignment for the benefit of creditors, or (e) publisher liquidates its business for any cause whatever, Author may terminate this Agreement by written notice and thereupon all rights granted by him hereunder shall revert to him.

*Id.* ¶ 26.

Triple Crown Publications began publishing *Sheisty* and *Still Sheisty* in 2004.  Baker Declaration ¶ 6.  Then in June 2010, Stringer dissolved Triple Crown Publications.  Pl. 56.1 Stmt. ¶¶ 5, 7.  After Baker learned this, she sent Triple Crown Publications a letter, dated October 10, 2011, asking to revert her rights in the books because Triple Crown Publications "liquidated its business on June 14th, 2010 without a proper Assignment agreement in place."  Baker Declaration, Exh. 5.  In a letter dated October 19, 2011, Stringer, Triple Crown Publications' owner, wrote back that Triple Crown Publications "did not liquidate its assets nor . . . file for bankruptcy."  *Id.*, Exh. 6 at 1.  Instead, according to Stringer, Triple Crown Publications had "assigned all of the rights and privileges in [*Sheisty* and *Still Sheisty*] to different business entities; Vickie Stringer Publishing, LLC and Triple Crown *Productions*, LLC," before Triple Crown Publications

dissolved "for tax purposes." *Id.* (emphasis added).[2]  Stringer also claimed to Baker in that letter

that Stringer had not "reverted the rights in [Baker's] contract" and that Stringer's "assignments

ha[d] [not] changed [Baker's] contract[] in any way." *Id.*  Baker never responded to Stringer's

October 19, 2011 letter.  Years later, however, Stringer changed her position.  In a January 2, 2019

email to the American Arbitration Association, Stringer claimed that the 2003 Agreement had "an

out of print clause and out of business clause [which] revert[ed] rights to [Baker]." *Id.*, Exh. 9 at

1.

     In October 2014, Triple Crown Publications (through Triple Crown Productions) licensed

the distribution rights for several works, including Baker's two books, to Urban Books, LLC.  Pl.

56.1 Stmt. ¶ 11; Dkt. 90 ("Perdomo Declaration") ¶ 9, Exh. 14 ("2014 Agreement").[3]  The 2014

Agreement also licensed the rights to two books by the author Toy Styles.  Pl. 56.1 Stmt. ¶ 11;

Perdomo Declaration ¶ 9; 2014 Agreement at 1.  In this agreement, Triple Crown Productions

referred to itself as "successor-in-interest to Triple Crown Publications."  2014 Agreement at 4.

The 2014 Agreement also warranted to Urban Books:

> (a) that it has full power to enter into this Agreement and to grant the rights granted
> herein; (b) that the Work will be protected by valid copyright; (c) that Licensee's
> exercise of its rights hereunder will not infringe, violate, nor be subject to any
> trademark, trade name, copyright, literary, artistic[,] dramatic, property rights, or
> any proprietary right at common law of any person[,] firm, or corporation; (d) if
> Licensor's edition of the Work contains printed, insert[,] or bound-in
> advertisements[,] Licensee shall be notified of such and is permitted, at its option,
> to delete same from its edition; (e) that the Work contains no matter that is obscene,

---

[2] Other evidence indicates that Triple Crown Publications had assigned these publishing rights in 2009 and recorded the assignment with the copyright office.  Pl. 56.1 Stmt. ¶ 6.

[3] The 2014 Agreement has "Urban Books c/o Kensington Publishing Corp" in its title. 2014 Agreement at 1.  Defendants claim that including "c/o Kensington Publishing Corp" is a mistake.  Def. Counter 56.1 Stmt. ¶ 11.  They contend that "Kensington does not have and has never had an address coincident with an Urban Books address, and is not [and] has never been formally associated with Urban Books, other than through an arms' length relationship whereby Kensington provides distribution services to Urban Books."  Def. Counter 56.1 Stmt. ¶ 11.  The Court need not decide Kensington's rights under the 2014 Agreement to decide these motions.

libelous, nor contains injurious formulas, recipes or instructions, nor is in violation of any common law right of privacy, nor otherwise in contravention of law.

*Id.* ¶ 5.

Two months after signing the 2014 Agreement, Stringer told Baker that she had licensed *Sheisty* and *Still Sheisty* to Urban Books.  Baker Declaration ¶ 14, Exh. 7.  Two days later, Baker sent a Facebook message to a Facebook profile in the name of "Carl Weber."  Baker Declaration ¶¶ 15-16.  Carl Weber is Urban Books' majority owner and manager.  Pl. 56.1 Stmt. ¶ 10.  The message said that Baker "would like to speak with you or someone in your camp that can answer some questions and concerns that [Baker] ha[d]" with the "distribution deal . . . for [Baker's] titles Sheisty and Still Sheisty."  Baker Declaration, Exh. 8 at 2-3.  After receiving no response, Baker sent another message on Christmas: "Carl can u please respond i would like to speak with u regarding my titles & your distribution agreement with Vickie Stringer."  *Id.* at 3.  It appears that no one responded to this message either.  *See id.* 3-4.

The parties dispute whether Weber ever saw Baker's Facebook messages.  In his deposition, Weber said that the Facebook profile is a "professional page" created by Kensington Publishing.  Perdomo Declaration, Exh. 21 ("Weber Deposition") at 21-22.  Kensington Publishing created the page "[b]ecause [Weber] refused to"; Weber is "not a believer in social media."  *Id.* at 22-23.  Weber also claimed that he did not "recall ever receiving a Facebook message from Ms. Baker regarding her works as an author."  *Id.* at 23.

In late March 2015, Styles contacted Weber by phone.  *See* Perdomo Declaration ¶ 10; Weber Deposition at 84.  Weber admitted that in this conversation Styles "reached out to [him] and asked [him] to not publish [Styles's] book."  Weber Deposition at 84.  Weber also said that Styles wished for him to not publish her works because "she had commenced litigation against Vickie Stringer."  Weber Declaration ¶ 12.  But Weber did "not recall any discussion of the reasons

for or facts concerning Ms. Styles'[s] litigation against Ms. Stringer."  *Id.*; *see also* Weber Deposition at 87-89.  Still, he "obliged [Styles's] request" and did not publish her works.  Weber Declaration ¶ 12; *see also* Pl. 56.1 Stmt. ¶ 14.

After the phone call, the parties dispute whether Weber received a follow-up email from Styles.  *See* Pl. 56.1 Stmt. ¶ 13; Def. Counter 56.1 Stmt. ¶ 1.  Baker provided an email chain from Styles to Baker's lawyer, Francelina Perdomo.  *See* Perdomo Declaration, Exh. 15 at 1.  That email chain includes an email from Styles to "urbanbooks@optonline.net" in April 2015 that asks Weber to "give [her] a status [on] [her] concern" about her books.  *Id.* at 1-2.  Below that email is a March 26, 2015, email from Styles (with no listed recipient) saying that she is attaching "the original paperwork for my Federal Court Case for copyright infringement."  *Id.* at 2.  In that federal complaint, Styles claims that Stringer failed to pay her royalties for her works and that the "Agreement[s] became voidable and the rights to Ms. Styles' Works should have been transferred back to her upon demand."  *Id.*, Exh. 16 ¶ 44; *see also id.* ¶¶ 29-38.

This same email chain between Styles and Baker's lawyer also includes a forwarded email with Styles listed as both the sender and receiver.  In that email, Styles says that she "do[es] not authorize" transferring the rights to her works because "Vickie no longer has legal rights to my books and her company was dissolved (proof can be provided)."  *Id.*, Exh. 15 at 3.  The parties similarly contest whether Weber received this forwarded email.  *See* Pl. 56.1 Stmt. ¶ 13; Def. Counter 56.1 Stmt. ¶ 13; Dkt. 96 ("Opposition") at 12-13.  Weber claims that he "did not receive these emails or referenced materials."  Def. Counter 56.1 Stmt. ¶ 13.  He instead claims that his "only communication with Ms. Styles on the subject of the Styles works being the phone conversation."  *Id.*

In April 2015, Urban Books began publishing and distributing *Sheisty*.[4]  Pl. 56.1 Stmt. ¶ 12.
Early the next year, Urban Books began publishing *Still Sheisty*.  *Id.*  Then in April 2017, Urban
Books combined *Sheisty* and *Still Sheisty* into *The Sheisty Saga* and started publishing it.  *Id.* ¶¶ 3,
12.  Baker never received royalties from Defendants for these publications.  *Id.* ¶ 17.  Instead,
Urban Books sent royalty checks to Triple Crown.  Weber Declaration ¶ 9.  After the checks came
back as undeliverable, Urban Books held the funds for Triple Crown.  *Id.*

In September 2018, Weber and Urban Books received a letter from Baker's counsel.  Pl.
56.1 Stmt. ¶ 15.  The letter told Weber and Urban Books that Baker had "sent a written notice to
Triple Crown Publishing . . . seeking reversion of her rights into the Works in accordance with the
provisions of the publishing agreement executed between Ms. Baker and Triple Crown."  Perdomo
Declaration, Exh. 17 at 1.  The letter claimed that Weber and Urban books "infringe[d] on Ms.
Baker's copyrights" by publishing her books without authorization.  *Id.*  The letter also said that
"[i]n the unlikely event that you believe and are able to demonstrate that Urban Books, LLC and
its Affiliates have the required authority to reproduce the Works and commercially exploit them,
it is imperative that you immediately contact [Baker's lawyer's] office to discuss a payment
arrangement."  *Id.* at 2.  Weber and Baker (or Baker's lawyer) did not have further discussions
before Baker sued.  Pl. 56.1 Stmt. ¶ 16.

## B.  Procedural History

Baker filed this lawsuit on February 5, 2019.  Dkt. 1.  She alleges eight causes of action:
(1) a declaratory judgment that she exclusively owns *Sheisty* and *Still Sheisty*, (2) a declaratory
judgment that all the licensing agreements are terminated or void, (3) copyright infringement, (4)

---

[4] Kensington Publishing Corp. was the professional publisher that Urban Books used to
distribute both books.  Pl. 56.1 Stmt. ¶ 9.

fraud, (5) civil conspiracy to commit fraud, (6) unjust enrichment, (7) contractual breach, (8) an accounting for her works, and (9) a constructive trust over all the defendants.  Dkt. 5 at 13-25. Defendants denied the claims and asserted affirmative defenses in their answers to the Complaint in March and April 2019.  Dkt. 29, 39.  Defendants also crossclaimed against the Defaulting Defendants seeking indemnification.  Dkt. 29.

After the Defaulting Defendants were properly served and failed to respond, Dkts. 36-38, the Clerk of the Court entered a Certificate of Default against them, Dkt. 45.  Baker then moved for default judgment as to those defendants on all her claims, including that Stringer fraudulently represented that Baker could not terminate the 2003 Publishing Agreement and fraudulently tried to assign Baker's publishing rights to Defendants.  *See* Dkt. 78 at 15-18.

Discovery concluded on January 22, 2021.  On February 26, 2021, Baker moved for partial summary judgment against Defendants on her copyright infringement claim.  Dkt. 88, 91.  She asks for compensatory damages for copyright infringement, statutory damages for willful copyright infringement, and interest, costs, and fees.  Dkt. 88 at 2.  Defendants opposed the motion for summary judgment on March 15, 2021.  Dkt. 96.

## II.  Legal Standards

A court should grant summary judgment only "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).  In determining whether a genuine factual dispute exists, a court "is not to weigh the evidence but is instead required to view the evidence in the light most favorable to the party opposing summary judgment, to draw all reasonable inferences in favor of that party, and to eschew credibility assessments."  *Weyant v. Okst*, 101 F.3d 845, 854 (2d Cir. 1996).

The moving party bears the initial burden to show the lack of a genuine dispute on each material element for the asserted claims. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). If the moving party carries her burden, the non-moving party must then "designate specific facts showing that there is a genuine issue for trial." *Holcomb v. Iona Coll.*, 521 F.3d 130, 137 (2d Cir. 2008) (quotations omitted); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986). A court must grant summary judgment "if, under the governing law, there can be but one reasonable conclusion as to the verdict." *Anderson*, 477 U.S. at 250.

For a default, "[e]ntry of a default judgment is appropriate when the adversary process has been halted because of an essentially unresponsive party." *Gucci Am., Inc. v. Tyrrell-Miller*, 678 F. Supp. 2d 117, 118 (S.D.N.Y. 2008) (quotations omitted). But "when a default is entered against one defendant in a multi-defendant case, the preferred practice is for the court to withhold granting default judgment until the trial of the action on the merits against the remaining defendants." *Economist's Advocate*, *LLC v. Cognitive Arts Corp*., No. 01 Civ. 9486 (RWS), 2004 WL 2650906, at *3 (S.D.N.Y. Nov. 22, 2004) (quotations and alterations omitted).

### III.  Baker's Motion for Summary Judgment

The Court first turns to Baker's motion for summary judgment on her copyright infringement claim against Defendants.  To establish copyright infringement, a plaintiff must show "(1) ownership of a valid copyright and (2) infringement of the copyright by the defendant." *Spinelli v. Nat'l Football League*, 903 F.3d 185, 197 (2d Cir. 2018) (quotations omitted).  In Baker's view, there are no genuine factual issues that Defendants infringed her copyrights by publishing *Sheisty* and *Still Sheisty* since 2014.  Defendants, in contrast, argue that even if Baker owns valid copyrights for those works, that they had a license to publish Baker's works based on the 2014 Agreement and Baker's conduct since that agreement.

As detailed below, Baker has shown that she owns valid copyrights for her two books but failed to show the absence of any material fact that Defendants infringed her copyrights. The Court thus denies her motion for partial summary judgment. But by moving for summary judgment on the copyright infringement claims, Baker has implicitly moved to strike affirmative defenses. The Court therefore, in analyzing Baker's motion, also addresses whether to strike certain affirmative defenses for trial.

## A. Valid Copyright Ownership

Baker has shown that she holds valid copyrights for *Sheisty* and *Still Sheisty*. By submitting registration certificates for each work, *see* Baker Declaration, Exhs. 1-2, Baker provided "*prima facie* evidence" that she owns the two works. *Psihoyos v. Pearson Educ., Inc.*, 855 F. Supp. 2d 103, 116 (S.D.N.Y. 2012).

Defendants do not contest in their opposition brief that Baker owns the copyright for the two books. *See* Opposition at 6 (challenging only whether they infringed the copyright). And in their Rule 56.1 statement, Defendants only claim that there are other copyright claimants for *Sheisty* and *Still Sheisty* listed under different copyright numbers. *See* Def. Counter 56.1 Stmt. ¶¶ 1-2. But these different copyright registrations do not change that Baker is the copyright claimant for both works under different registration numbers. Instead, the existence of other copyright claimants would only be relevant as a damages consideration if liability is found. *See New Line Cinema Corp. v. Russ Berrie & Co.*, 161 F. Supp. 2d 293, 302 (S.D.N.Y. 2001). Defendants have therefore failed to rebut the ownership presumption. *See Psihoyos*, 855 F. Supp. 2d at 116.

## B. Copyright Infringement

The Court turns next to whether Baker has shown that Defendants infringed her copyrights. "A copyright holder possesses the exclusive right to 'reproduce copyrighted work in copies' and

to 'distribute copies … of the copyrighted work to the public by sale.'" *Id.* at 119 (alteration in original) (quoting 17 U.S.C. § 106). There is no dispute that Defendants published Baker's works without her express authorization. But that does not end the inquiry. "[I]f Defendants can show that the copying was authorized, or that they are entitled to any other defense to copyright infringement, then they will not be held liable." *Id.*

Defendants raise four defenses to copyright infringement: (1) Defendants had a license to publish the works, (2) equitable estoppel bars Baker's copyright claims, (3) the doctrine of laches bars Baker's copyright claims, and (4) Defendants lacked notice of Baker's copyright. While Defendants have the "burden to prove that they are entitled to these defenses, . . . on a motion for summary judgment it remains [Baker's] burden to show the absence of genuine issues of material fact that Defendants will be unable to prove entitlement to the defenses." *Id.* The Court will address each defense in turn.

### 1. License

A license acts as an affirmative defense: "a copyright owner who licenses his work to another waives his right to sue the licensee for copyright infringement." *Spinelli*, 903 F.3d at 202 (quotations omitted). Because a license acts as an affirmative defense, Defendants have "the burden of coming forward with evidence of one." *Id.* (quotations omitted). That evidence must show that they have one of the "three types of copyright licenses: (1) written; (2) oral; [or] (3) implied." *Gasery v. Kalakuta Sunrise, LLC*, 422 F. Supp. 3d 807, 815 (S.D.N.Y. 2019). A written license may be either exclusive or nonexclusive. *See id.* But an oral or implied license "can only be non-exclusive." *Id.* (quotations omitted). Once a defendant shows that he or she had a license to use a work, the failure to pay the copyright owner does not yield a copyright claim. *Graham v. James*, 144 F.3d 229, 236 (2d Cir. 1998). The failure to pay instead gives rise only to a contract claim. *Id.*

### i.   Actual License

Defendants first contend that they have an actual written license to publish Baker's works. While acknowledging that Baker did not personally sign a contract with them, they argue that the 2014 Agreement between Triple Crown Productions and Urban Books gave them a license to publish her works.  Opposition at 6-8.  In Defendants' view, the 2003 Agreement allowed Triple Crown Publications to assign its rights to Triple Crown Productions, who could then license Baker's books to other parties under the 2014 Agreement.  *Id.*  Baker resists this argument by pointing to the letter she sent on October 10, 2011.  That letter combined with "Triple Crown Publications' dissolution" in 2011 reverted the rights to the books to her under the 2003 Agreement, according to Baker.  Dkt. 91 ("Motion") at 11.  She therefore contends that Triple Crown Productions lacked the power to license her works to Defendants.

The question of whether the 2014 Agreement gave Defendants an actual license to publish Baker's works thus hinges on the 2003 Agreement and whether Triple Crown Publications permissibly assigned the rights to *Sheisty* and *Still Sheisty* to Triple Crown Productions.  The relevant section of the 2003 Agreement provides:

> **BANKRUPTCY:** If (a) petition in bankruptcy is filed by Publisher, or (b) a petition in bankruptcy is filed against Publisher and such petition is finally sustained, or (c) a petition for arrangement is filed by publisher or a petition for reorganization is filed by or against Publisher, and an order is entered directing the liquidation of Publisher as in as in [sic] bankruptcy, or (d) Publisher makes an assignment for the benefit of creditors, or (e) publisher liquidates its business for any cause whatever, Author may terminate this Agreement by written notice and thereupon all rights granted by him hereunder shall revert to him.

2003 Agreement ¶ 26.  The parties seemingly agree that under this provision, Baker could terminate the 2003 Agreement after providing written notice if one of the five provisions' requirements, set out at (a) to (e), are met.  *See* Motion at 11-12; Opposition at 6-9; Dkt. 103 ("Reply") at 2-3.  But the parties differ from there on how to interpret the 2003 Agreement.

"The interpretation of an unambiguous contract . . . is . . . a question of law reserved for the court." *Golden Pacific Bancorp v. FDIC.*, 273 F.3d 509, 515 (2d Cir. 2001) (citation omitted). But ambiguous contractual language that yields "differing interpretations of the contract present[s] a triable issue of fact." *Id.* (quotations omitted).  To enter summary judgment for Baker, she must therefore show not only that her interpretation is best, but that the 2003 Agreement unambiguously yields it.  *See id.* at 514-15; *Bank of Am. Nat'l Tr. & Sav. Ass'n v. Gillaizeau*, 766 F.2d 709, 715 (2d Cir. 1985).

Here, there remain material issues to be resolved as to whether any of the five provisions were satisfied when Baker sent the termination notice in 2011.  Because Triple Crown Publications did not go bankrupt, the only plausible provisions that apply here are provisions (c) and (e).  Yet neither provision unambiguously applies.

Consider first provision (c)—"a petition for arrangement is filed by publisher or a petition for reorganization is filed by or against Publisher, *and* an order is entered directing the liquidation of Publisher as in as in [sic] bankruptcy."  2003 Agreement ¶ 26 (emphasis added).  Triple Crown Publications dissolved in 2010.  Pl. 56.1 Stmt. ¶ 5.  The letter from Stringer to Baker characterized this dissolution as assigning all assets to "Vickie Stringer Publishing, LLC and Triple Crown Productions, LLC. . . . for tax purposes."  Baker Declaration, Exh. 6 at 1.  That might be understood as a reorganization.  Yet provision (c) also requires that "an order is entered directing the liquidation of Publisher as in [a] bankruptcy."  2003 Agreement ¶ 26.

Neither party suggests how the Court should interpret this clause.  But a plausible reading is that this clause requires entry of an order (resembling a bankruptcy order) to liquidate Triple Crown Publications.  Under this plausible reading, summary judgment is inappropriate.  *See Mauney v. Imperial Delivery Servs., Inc.*, 865 F. Supp. 142, 152 (S.D.N.Y. 1994), *opinion*

13

*corrected* (Oct. 4, 1994).  Baker points to no facts suggesting that Stringer reorganized—let alone

liquidated— Triple Crown Publications in response to an order.  And that says nothing on whether

that hypothetical order resembled orders given in a bankruptcy.

Consider next provision (e)—"publisher liquidates its business for any cause whatever."

2003 Agreement ¶ 26.  This provision also has two plausible constructions.  One reading is what

Baker seemingly puts forward: if Triple Crown Publications dissolves and assigns its rights to

others, it has "liquidate[d] its business."  *See* Motion at 11.  Under this reading, liquidation means

to wind down the business.  *See Liquidate*, *Black's Law Dictionary* (11th ed. 2019) ("To wind up

the affairs of (a corporation, business, etc.).").  Because Triple Crown Publications wound down

the business and assigned its rights to others, provision (e) should apply, under Baker's view.

But that is not the only plausible reading.  Another plausible reading is that provision (e)

refers only to liquidations in the bankruptcy context.   Under this view, liquidation refers to

determining "the liabilities and distribut[ing] the assets of (an entity) . . . in bankruptcy."  *Id.*; *but

see id.* (also referring to "dissolution").  That "liquidation" refers only to bankruptcy is a reasonable

construction.    For one,  the section of  the  agreement  containing  this  provision  is  titled

"**BANKRUPTCY**."  2003 Agreement ¶ 26.  And the surrounding four provisions all refer to

bankruptcy.  *See id.*  Under the *ejusdem generis* principle, when "general words follow specific

words[,] . . . the general words are construed to embrace only objects similar in nature to those

objects enumerated by the preceding specific words."  *Cir. City Stores, Inc. v. Adams*, 532 U.S.

105, 114-15 (2001) (quotations omitted).   Thus, all the surrounding provisions referencing

bankruptcy could limit the phrase "liquidat[ion] . . . for any cause what[so]ever" to mean only

liquidations relating to bankruptcy.  *See Rothenberg v. Lincoln Farm Camp, Inc.*, 755 F.2d 1017,

1020 (2d Cir. 1985) (denying summary judgment by applying *ejusdem generis* principle to find that a clause had more than "one reasonable interpretation").

Baker resists these interpretations by pointing to Stringer's email to the American Arbitration Association when Stringer claimed that the rights reverted to Baker in 2011. *See* Reply at 2-3. But that email does not make ambiguous language unambiguous. For one, the email contradicts her earlier response of October 19, 2011 to Baker, thus presenting a factual issue. More to the point, "[s]ubsequent commentary by one of the parties to a contract[,] . . . offered in connection with a law suit, cannot shed light on the original meaning of the instrument." *Royal Park Invs. v. U.S. Bank Nat'l Ass'n*, 319 F.R.D. 122, 130 (S.D.N.Y. 2016). Said differently, the Court looks to the contract's objective language to understand the parties' intentions, not the "party's statements in subsequent litigation." *Id.* (quotations omitted). Stringer's later self-serving statements thus do not definitively say what the 2003 Agreement meant.

Genuine factual issues therefore remain for the jury as to whether the publishing rights reverted to Baker in 2011 pursuant to the 2003 Agreement.[5] This in turn means that there are genuine issues of material fact on whether Triple Crown Productions granted Defendants an actual license to use Baker's works.

### ii. Implied License

Defendants next argue that even if Triple Crown Productions lacked the authority to grant them a license to publish Baker's works, that they had an implied one based on Baker's conduct

---

[5] Because provisions (c) and (e) are ambiguous, the Court need not decide whether the phrase "all rights granted by [Baker] . . . shall revert to [her]" is also ambiguous. Defendants claim that this phrase meant that Triple Crown Publications had to grant the rights back to Baker if provisions (c) or (e) or met, but that the rights did not automatically revert to Baker. Opposition at 7. This meant (in Defendants' view) that Triple Crown Productions still held the rights when it signed the 2014 Agreement. *Id.*

after the execution of the 2014 Agreement.  In their view, Triple Crown Productions at least had apparent authority to grant Defendants a license.  That apparent authority, coupled with Baker's actions after the 2014 Agreement, created an implied license to use Baker's works.

To determine whether Defendants had an implied license, the Court needs to first determine what test to apply.  "The Second Circuit has not yet developed a test for determining whether a copyright owner has conveyed an implied license." *Otto v. Hearst Commc'ns, Inc.*, 345 F. Supp. 3d 412, 434 (S.D.N.Y. 2018); *accord Jose Luis Pelaez, Inc. v. McGraw-Hill Glob. Educ. Holdings LLC*, 399 F. Supp. 3d 120, 141 (S.D.N.Y. 2019).  And as a judge of this District aptly said: "The law in the area of implied licenses shows a measure of conflict." *Psihoyos*, 855 F. Supp. 2d at 119.

At times, judges in this District have embraced a strict three-part test to discover whether an implied license exists. *See Associated Press v. Meltwater U.S. Holdings, Inc.*, 931 F. Supp. 2d 537, 562 (S.D.N.Y. 2013).  This test requires a defendant to show "that (1) the licensee requested the creation of a work; (2) the licensor made that particular work and delivered it to the licensee who requested it; and (3) the licensor intended that the licensee copy and distribute his work." *Id.*; *see also ABKCO Music, Inc. v. Sagan*, No. 15 Civ. 4025 (ER), 2018 WL 1746564, at *18 (S.D.N.Y. Apr. 9, 2018).  Under this test, an implied license "will only be found when a copyright owner creates a work at the request of the licensee and with the intention that the licensee exploit it." *Weinstein Co. v. Smokewood Ent. Grp., LLC*, 664 F. Supp. 2d 332, 344 (S.D.N.Y. 2009); *see also Country Rd. Music, Inc. v. MP3.com, Inc.*, 279 F. Supp. 2d 325, 328 (S.D.N.Y. 2003).

At other times, judges in this District have taken the view that the question of whether the parties created an implied license "comes down to whether there was a 'meeting of the minds' between the parties to permit the particular usage at issue." *Psihoyos*, 855 F. Supp. 2d at 124.  In

applying this test, courts must ask whether "the totality of the parties' conduct indicates an intent to grant permission to use the copyrighted work." *Jose Luis Pelaez, Inc.*, 399 F. Supp. 3d at 141 (quotations omitted).

Baker urges the Court to adopt the first test in analyzing whether she conveyed an implied license to Defendants. Thus, Baker argues that Defendants must prove all three elements to show that she granted them an implied license. Baker's view has some support in some recent case law. In *ABKCO*, for example, the court commented that the Second Circuit has "endorsed the view of other circuits 'and cautioned that implied non-exclusive licenses should be found 'only in narrow circumstances where one party created a work at the other's request and handed it over intending that the other copy and distribute it.'" 2018 WL 1746564, at *18 (quoting *Weinstein Co.*, 664 F. Supp. 2d at 344 (quoting *SmithKline Beecham Consumer Healthcare, L.P. v. Watson Pharms., Inc.*, 211 F.3d 21, 25 (2d Cir. 2000) (citing *Effects Assocs., Inc. v. Cohen*, 908 F.2d 555, 558 (9th Cir. 1990)))).

But the Court does not read the Second Circuit's cases so narrowly. The test applied in *ABKCO* came from *Weinstein*, which "originated in the Ninth Circuit decision in *Effects Associates, Inc. v. Cohen*, 908 F.2d 555 (9th Cir. 1990)." *Psihoyos*, 855 F. Supp. 2d at 120. *Effects*, however, did not create an exclusive test. *Effects* involved creating an implied license in a work-for-hire relationship without addressing how an implied license might be created in other contexts. The Second Circuit has never held[6] that the *Effects* test provides the only way to prove

---

[6] For example, in *SmithKline Beecham*, the Second Circuit commented that "courts have found implied licenses only in 'narrow' circumstances where one party 'created a work at the other's request and handed it over, intending that the other copy and distribute it.'" 211 F.3d at 25 (quoting *Effects*, 908 F.2d at 558) (alterations omitted). But the Second Circuit did not decide that issue. *See id.*

a copyright holder granted an implied license to an alleged infringer.  Leading copyright authorities similarly have cautioned that courts should not "transmute those three factors into the only applicable test" nor "hold that there can be no implied license when one of those factors is absent." 3 Melville B. Nimmer & David Nimmer, *Nimmer on Copyright* § 10.03[A][7] (2021); *see also* 2 William F. Patry, *Patry on Copyright* § 5:131 (2021) (while the three factors are "perfectly acceptable, [they] do not exhaust the possibilities" for creating an implied license).

To view the three factors as absolute would mean that there could rarely if ever be an implied license outside the work-for-hire situation.  *See Photographic Illustrators Corp. v. Orgill, Inc.*, 953 F.3d 56, 62 (1st Cir. 2020).  That is because the *Effects* test would make an implied license a near legal impossibility outside of a work-for-hire relationship—*i.e.*, when the party did not create the work for another.  *See id.*  But that makes little sense.  "Creating material at another's request is not the essence of a license; an owner's *grant of permission* to use the material is." *MidlevelU, Inc. v. ACI Info. Grp.*, 989 F.3d 1205, 1216 (11th Cir. 2021).

Courts, including, most Courts of Appeals to have considered the issue, have therefore recognized that an owner can grant an implied license in "[c]ircumstances outside a work-for-hire situation."  *Id.* (collecting cases); *see also Psihoyos*, 855 F. Supp. 2d at 125; *Jose Luis Pelaez, Inc.*, 399 F. Supp. 3d at 141.  In those circumstances, a court asks whether "the totality of the parties' conduct indicates an intent to grant permission to use the copyrighted work."  *Jose Luis Pelaez, Inc.*, 399 F. Supp. 3d at 141 (quotations omitted).  "When an owner's conduct 'clearly' manifests 'a consent to use' of copyrighted material, the owner impliedly grants a nonexclusive license." *MidlevelU, Inc.*, 989 F.3d at 1216 (quoting *De Forest Radio Tel. & Tel. Co. v. United States*, 273 U.S. 236, 241 (1927)) (alterations omitted).

That conduct need not be express.  Instead, silence can show consent to use copyrighted material.  *See Keane Dealer Servs., Inc. v. Harts*, 968 F. Supp. 944, 947 (S.D.N.Y. 1997).  Silence can show consent when the copyright holder (1) knew that an alleged infringer used the copyright and (2) remained silent while the alleged infringer used the copyright.  *See id.*  Another factor in determining whether Baker granted Defendants a license to use her works is whether Triple Crown Productions "retained . . . apparent authority to offer licenses of [Baker's] works after [October 2011]."  *Psihoyos*, 855 F. Supp. 2d at 125.  That apparent authority can provide more evidence that the copyright owner consented to the license.  *See id.*[7]  Here, there are genuine factual issues on whether Baker consented to Defendants using her copyright through her silence and Triple Crown Productions' apparent authority.

First, it is unclear whether Baker knew that Defendants would use her copyright.  Stringer told Baker that she had licensed her books to Urban Books with "the same terms as [the 2003 Agreement] states."  Baker Declaration, Exh. 7; *see also* P. Rule 56.1 ¶ 11.  In that email, Stringer told Baker to "email [her] with any questions or concerns."  Baker Declaration, Exh. 7.  Yet Baker never did so.  And Baker sent two Facebook messages about this agreement to Weber.  Baker Declaration ¶¶ 15-16.  In these messages, Baker acknowledged the "distribution deal . . . for . . .

---

[7] As explained below, there are genuine questions of material fact on whether Baker's conduct coupled with Triple Crown Productions' apparent authority to grant a license created an implied license.  The Court therefore need not decide whether apparent authority *alone* can grant an implied license.  *Compare, e.g.*, *Psihoyos*, 855 F. Supp. 2d at 125 ("[[I]f [the party who licensed the material] retained actual or apparent authority to offer licenses of Plaintiffs' works after December 2008, Defendants could argue that the 'knowledge and acquiescence' of [that party] alone gave rise to an implied license."), *and Jackson v. Odenat*, 9 F. Supp. 3d 342, 363 (S.D.N.Y. 2014) (recognizing apparent authority defense), *with* 4 Melville B. Nimmer & David Nimmer, *Nimmer on Copyright* § 13.08[B][1] n.18 (2021) ("[T]he defense of apparent authority is not recognized in copyright law."), *and Beastie Boys v. Monster Energy Co.*, 983 F. Supp. 2d 338, 340 (S.D.N.Y. 2013) (rejecting apparent authority defense (through a breach of contract claim) to deflect liability for copyright infringement).

titles Sheisty and Still Sheisty." *Id.*, Exh. 8 at 3.  Besides these two messages, Baker *never* reached

out to Defendants.  A reasonable person could thus infer that Baker knew or should have known

that Defendants would publish her works relying on Stringer (through Triple Crown Productions)

acting as her agent in creating the 2014 Agreement.  *See Jackson*, 9 F. Supp. 3d at 363.

Second, there are genuine factual issues on whether Baker's silence after the 2014

Licensing Agreement "manifest[ed] a consent to use of [her] copyrighted material."  *MidlevelU*,

989 F.3d at 1216 (quotations and alterations omitted).  Again, Baker never told Defendants that

they could not publish her works, even though she knew that Defendants had signed an agreement

to do so.  She instead only sent Facebook messages saying she had "questions and concerns" with

the deal.  Baker Declaration, Exh. 8 at 3.  Baker also knew that Stringer had rejected her October

10, 2011, letter claiming to revoke Stringer's publication rights.  Yet Baker never followed up on

whether Stringer was correct that Baker could not revoke the publication rights.  A person could

reasonably infer from all this that Baker knew that Stringer was representing herself to Defendants

as Baker's agent and that Baker consented to it.  Under these circumstances, there are therefore

genuine issues of material fact on whether Baker remaining silent after she knew Defendants

signed the 2014 Agreement manifested consent for Defendants to publish her books.

### 2.  Equitable Estoppel

Defendants next argue that Baker is estopped from bringing her copyright infringement

claim because Baker knew that Defendants would publish her works yet was silent for four years.

Equitable estoppel applies when "the enforcement of the rights of one party would work an

injustice upon the other party due to the latter's justifiable reliance upon the former's words or

conduct."  *Marvel Characters, Inc. v. Simon*, 310 F.3d 280, 292 (2d Cir. 2002) (quotations

omitted).  To establish an estoppel defense in the copyright context, a defendant must show that:

> (1) plaintiff had knowledge of the defendant's infringing conduct; (2) plaintiff either (a) intended that defendant rely on plaintiff's acts or omissions suggesting authorization, or (b) acted or failed to act in such a manner that defendant had a right to believe it was intended to rely on plaintiff's conduct; (3) defendant was ignorant of the true facts; and (4) defendant relied on plaintiff's conduct to its detriment.

*Psihoyos*, 855 F. Supp. 2d at 129 (citations omitted).  This defense is hard to show: "estoppel is a drastic remedy and must be utilized sparingly."  *Id.* (quotations and alterations omitted).  Still, silence and inaction, especially for a prolonged period, can make this showing.  *See DeCarlo v. Archie Comic Publ'ns, Inc.*, 127 F. Supp. 2d 497, 510 (S.D.N.Y.), *aff'd,* 11 F. App'x 26 (2d Cir. 2001) ("Silence or inaction in the face of an explicit contrary assumption by the opposing party may be sufficient to induce justifiable reliance by a defendant that a plaintiff will not later assert a claim.").

Here, there are genuine issues of material fact that preclude striking the estoppel affirmative defense.  Again, Baker knew in 2014 that Triple Crown Productions signed a licensing agreement with Urban Books to publish *Sheisty* and *Still Sheisty*.  *See* Pl. 56.1 Stmt. ¶ 11.  And there are genuine disputes about whether Baker knew that Defendants published and distributed the works after that time.  Plus, there are genuine disputes about "whether, to the extent that [Baker] did not approve of [Defendants distributing Baker's works], Defendants were ignorant of this fact, and acted in reasonable reliance upon their assumptions."  *Psihoyos*, 855 F. Supp. 2d at 129.  So for similar reasons as the implied license, the Court denies summary judgment for Baker on Defendants' estoppel defense.

### 3.  Laches

Defendants next claim that the laches doctrine bars Baker's copyright infringement claims.  "To prevail on laches grounds, a party must demonstrate both that there was a delay in filing suit that was unreasonable, and that the delay caused the defendant prejudice."  *Cooley v. Penguin Grp.*

*(USA) Inc.*, 31 F. Supp. 3d 599, 612 (S.D.N.Y. 2014), *as corrected* (July 14, 2014).  But laches "cannot be used to defeat a claim filed within the Copyright Act's three-year statute of limitations." *Id.*

That three-year statute of limitations period starts when "the copyright holder discovers, or with due diligence should have discovered, the infringement."  *Sohm v. Scholastic Inc.*, 959 F.3d 39, 50 (2d Cir. 2020) (quotations omitted).  Under the separate accrual doctrine, "when a defendant commits successive violations, the statute of limitations runs separately from each violation." *Petrella v. Metro-Goldwyn-Mayer, Inc.*, 572 U.S. 663, 671 (2014).  An infringer commits a new wrong "[e]ach time an infringing work is reproduced or distributed," so "each infringing act starts a new limitations period."  *Id.*  "Thus, when a defendant has engaged (or is alleged to have engaged) in a series of discrete infringing acts, the copyright holder's suit ordinarily will be timely under § 507(b) with respect to more recent acts of infringement (*i.e.,* acts within the three-year window), but untimely with respect to prior acts of the same or similar kind."  *Id.* at 672.

Here, Baker sued Defendants on February 5, 2019.  Under *Petrella*, there is a separate statute of limitations for each alleged infringement—each time Defendants published and sold Baker's work.  Laches therefore cannot bar claims for any publication on or after February 5, 2016, as they would fall within the three-year statute of limitations period.  The Court therefore strikes the laches affirmative defense for any alleged infringement occurring on or after February 5, 2016.

But the same is not true for any publication before February 5, 2016.  Here, there are genuine claims issues of material fact on whether Baker should have known that Defendants published her works based on the 2014 Agreement.  If the 2014 Agreement provided sufficient notice to discover the infringement, then Baker's claims started to accrue as soon as Defendants published her works.

### 4.  Notice

Lastly, Defendants argue that they lacked "constructive notice of Plaintiff's alleged copyrights" because there are multiple copyrights for both works.  Opposition at 14.  Defendants are unclear whether they are raising this as a defense to liability or damages.  To the extent that Defendants raise constructive notice as a defense to liability, there are no genuine issues of material fact that would allow for this defense to proceed.

Baker recorded copyrights for the books in 2003 and 2004.  Pl. 56.1 Stmt. ¶¶ 1-3.  That "put the world on constructive notice" that she owned the work.  *Complex Sys., Inc. v. ABN Ambro Bank N.V.*, 979 F. Supp. 2d 456, 472 (S.D.N.Y. 2013).  "Copyright infringement is a strict liability offense in the sense that a plaintiff is not required to prove unlawful intent or culpability."  *EMI Christian Music Grp., Inc. v. MP3tunes, LLC*, 844 F.3d 79, 89 (2d Cir. 2016).  While Defendants may show that they were "misled by a copyright notice," that serves as no defense "if, before the infringement began, the work had been registered in the name of the true copyright owner."  4 Melville B. Nimmer & David Nimmer, *Nimmer on Copyright* § 13.08[A] (2021).  Defendants thus cannot point to the other copyright registration numbers for Baker's works, Opposition at 14, as a defense to liability—"innocent infringement does not constitute a defense to liability," *New Line Cinema*, 161 F. Supp. 2d at 302.  Instead, Defendants' innocent intent bears only "on the issue of damages."  *Id.*[8]  The Court therefore strikes constructive notice as a defense to liability.

### IV.  Baker's Motion for Default Judgment

Lastly, Baker has moved for default judgment against the Defaulting Defendants, specifically, Vickie Stringer, Vickie Stringer Publishing LLC, Vickie Stringer Agency LLC, and

---

[8] To the extent that Defendants raise their "actual notice" argument as another defense to liability, Opposition at 11-13, the same reasoning applies.

Triple Crown Publications. *See* Dkt. 75. No Defaulting Defendant has moved to vacate the Certificate of Default. But effective relief cannot be granted against these Defaulting Defendants before Baker's rights under the 2003 Agreement, including whether Baker terminated the agreement in 2011, are resolved. *See Economist's Advocate, LLC*, 2004 WL 2650906, at *3 ("When a default is entered against one defendant in a multi-defendant case, the preferred practice is for the court to withhold granting default judgment until the trial of the action on the merits against the remaining defendants." (quotations and alterations omitted)). The Court therefore denies without prejudice Baker's motion for default judgment.

## V. Conclusion

For all the reasons given, the Court denies Baker's motions for summary judgment and default judgment. The Clerk of the Court is respectfully directed to terminate the motions pending at Docket Numbers 75 and 88.

SO ORDERED.

Dated: September 30, 2021
New York, New York

JOHN P. CRONAN
United States District Judge